UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
JENNIFER R. MONTGOMERY,

                              Plaintiff,

      -against-                                    **MEMORANDUM**
                                                   **AND ORDER**
                                                   03 CV 5387 (ENV) (JMA)


MICHAEL CHERTOFF,[1] SECRETARY, U.S.
DEPARTMENT OF HOMELAND SECURITY,

                              Defendant.
------------------------------------------------------------------------X

A P P E A R A N C E S:

Alan E. Wolin, Esq.
420 Jericho Turnpike, #215
Jericho, New York 11753
*Attorney for Plaintiff*

Steven M. Warshawsky
Assistant U.S. Attorney
147 Pierrepont Street
Brooklyn, New York 11201
*Attorney for Defendant*

**AZRACK, United States Magistrate Judge:**

        Plaintiff Jennifer Montgomery brings this action against her employer, defendant U.S.

Department of Homeland Security ("DHS"), alleging that DHS discriminated against her on the

basis of her disability and sex in violation of the Rehabilitation Act of 1973, 29 U.S.C. §791, et seq.,

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of the Department of
Homeland Security, Michael Chertoff, is automatically substituted for former Secretary Thomas
Ridge as the defendant in this case.

and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. Plaintiff claims that defendant discriminated against her, created a hostile work environment, failed to reasonably accommodate her, and retaliated against her.

By motion dated August 17, 2006, defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The parties consented to me presiding over this motion, pursuant to 28 U.S.C. § 636(c). Viewing the evidence in the light most favorable to plaintiff, and for the reasons set forth below, I find that there are no material facts in dispute such that a reasonable jury could conclude that plaintiff was the subject of unlawful discrimination or retaliation. Accordingly, summary judgment is granted to defendant.

## I.  FACTS

The following facts are taken from defendant's Statement of Undisputed Material Facts pursuant to Local Rule 56.1 ("Def. 56.1 Statement") and plaintiff's Counter-Statement pursuant to Local Rule 56.1 ("Pl. 56.1 Statement") and are undisputed unless otherwise noted. Because this is defendant's motion, the facts will be viewed in the light most favorable to the plaintiff.

Plaintiff Montgomery is employed by the United States Customs Service (now Customs and Border Protection) (collectively, "Customs Service") as a Canine Enforcement Officer (now Customs and Border Protection Officer) (collectively, "CEO") and has been since September 2, 1997. Throughout her employment, plaintiff has been assigned to the Canine Unit at John F. Kennedy Airport in Queens, New York ("JFK Airport"), with few exceptions. (Def. 56.1 Statement ¶ 5; Pl. 56.1 Statement ¶ 5.) As a CEO, plaintiff is responsible for screening arriving cargo, passengers or conveyance for contraband, using her assigned detector dog. (Def. 56.1 Statement ¶ 1.) She is authorized to conduct searches, make seizures, and gather evidence for use in criminal and

civil proceedings; to detain and arrest suspected criminals, stowaways, terrorists, and other persons who violate federal law; and to carry a firearm during the performance of her duties. (Id.)

Plaintiff has been promoted throughout her employment and received regular automatic step or grade increases. (Def. 56.1 Statement ¶ 6; Pl. 56.1 Statement ¶ 6.) Plaintiff started her employment with the Customs Service as a GS-5, Step 1. (Def. 56.1 Statement ¶ 6.) Each year thereafter, through the date of her April 2005 deposition, she received a promotion to another grade or step.[2] (Id.) Plaintiff maintains that many of the changes in grade or step were not promotions, but rather were automatic step or grade increases. (Pl. 56.1 Statement ¶ 6.) Plaintiff also received "successful" performance evaluations each year of her employment. (Id. ¶ 7.)

Montgomery is a female with Attention Deficit Hyperactivity Disorder ("ADHD" or "ADD"). (Pl. 56.1 Statement ¶ 8.) She contends that she has had ADHD symptoms all her life and was first diagnosed at age 5. (Id.) Symptoms of plaintiff's ADHD include: difficulty concentrating and maintaining attention, irritability, restlessness, hyperactivity, impulsiveness, problems remembering, and quickness to anger. (Def. 56.1 Statement ¶ 12-32.) She has been treated by various physicians who have documented these symptoms in varying degrees. (Id.) Plaintiff takes medication which helps her symptoms, but does not cause them to completely disappear. (Pl. 56.1 Statement ¶¶ 9, 32, 145.) Plaintiff asserts that she has always been able to complete her CEO job duties successfully, regardless of her ADHD symptoms. (Id. ¶ 33-46; Compl. ¶ 16.)

Montgomery alleges that she has been discriminated against by her employer on the basis

---

[2] In September 1998, plaintiff was promoted to GS-7, Step 1. (Pl. 56.1 Statement ¶ 6.) In September 1999, she was promoted to GS-9, Step 1. (Id.) In September 2000, she was promoted to GS-9, Step 2. (Id.) In September 2001, she was promoted to GS-9, Step 3. (Id.) In August 2002, she was promoted to GS-11, Step 1. (Id.) In November 2003, she was promoted to GS-11, Step 2. (Id.) In November 2004, she was promoted to GS-11, Step 3. (Id.)

of disability and sex. She asserts claims of disparate treatment, hostile work environment, failure to accommodate, and retaliation. The crux of her disability claim is that her ADHD affects her ability to get along with her co-workers because of her general irritability and impulsiveness. These personality traits, which plaintiff asserts are "manifestations" of her ADHD, have created a situation at work where she is generally disliked, insulted, and made to feel like an outcast. (See, e.g., Pl. 56.1 Statement ¶¶ 127, 129-31; Def. 56.1 Statement ¶¶ 114, 122.)

In general, plaintiff alleges that there is an "in group" of CEOs, which is respected by the superiors and the "elite or special handlers," and an "out group," which is not, and that she has always been part of the "out group." (Def. 56.1 Statement ¶¶ 103, 114.) It is generally known that plaintiff is disliked. (See, e.g., id. ¶ 129.) She also claims that she has been treated in a "harsh manner," "singled out," and put in the "hot seat" by her supervisor, SCEO Steve Failla. (Def. 56.1 Statement ¶¶ 118, 124.)

Plaintiff also alleges specific instances of discrimination. For instance, she complains of being yelled at by SCEO Failla "in a violent manner for no justifiable reason." (Pl. 56.1 Statement ¶ 120.) She also claims she was discriminately threatened and disciplined on numerous occasions. (Def. 56.1 Statement ¶¶ 121-23, 126.) Rumors were spread about plaintiff (Id. ¶¶ 125, 132) and posters mocking her were found in and around the workplace (Id. ¶¶ 133-35.) Plaintiff also complains that her supervisor made inappropriate comments with sexual overtones. (Id. ¶ 136.) She claims that she has been given unfair work assignments and overtime assignments (Pl. 56.1 Statement ¶¶ 147-48; Compl. ¶¶ 22(l), (q), (r)) and is not trained in the same way as others (Pl. 56.1 Statement ¶¶ 167-68; Compl. ¶¶ 22(s) - (u)).

Plaintiff first contacted an Equal Employment Opportunity ("EEO") counselor on April 27,

2001. (Def. 56.1 Statement ¶ 138.) She then filed a formal discrimination complaint on July 12, 2001, claiming that she had been discriminated against on the basis of her sex and disability. (Id. ¶ 139.)

In October 2001, a meeting was held to discuss plaintiff's complaint. (Id. ¶ 89.) Plaintiff attended this meeting, along with the EEO investigator and another EEO representative, a union representative, Area Director Susan Mitchell (the senior Customs Service official at JFK Airport), and Assistant Area Director Joe Rivera. (Id.) Plaintiff became upset and started crying during this meeting. (Id.) At the meeting, Mitchell requested that plaintiff provide the agency with medical documentation about her ADHD and how it might affect her duties as a CEO, including her ability to carry a firearm. (Id. ¶ 90.) In response to this request, Dr. Feldman of the Long Island Counseling Center ("LICC") wrote a letter on October 29, 2001, documenting plaintiff's ADHD and stating, in sum and substance, that plaintiff had responded well to treatment and medication, should be able to function in her capacity as a CEO, but could benefit from workplace accommodations. (Id. ¶ 92.) On December 4, 2001, Dr. Feldman wrote another letter for plaintiff in response to a request from the EEO office. (Id. ¶ 94.) In contrast to the October letter, this letter stated that plaintiff's ADHD has interfered in all aspects of her life, including her functioning on the job. (Id.)

By letter dated February 26, 2002, Mitchell placed plaintiff on restricted duty, suspended her authority to carry a firearm, and directed her to undergo a fitness-for-duty examination. (Id. ¶ 96.) To comply with this request, plaintiff first submitted to a physical examination by Dr. Avram Nemetz. Dr. Nemetz examined plaintiff and recommended that she undergo a "full evaluation by an independent psychiatric consultant." (Id. ¶ 97.) By letter dated March 28, 2002, Mitchell directed plaintiff to undergo such an evaluation by Dr. Paul Podell, to evaluate plaintiff's capability

to perform the full range of duties required of a CEO.  (Id. ¶ 98.)  The examination by Dr. Podell took place on April 9, 2002.  (Id. ¶ 99.)  Dr. Podell concluded that plaintiff's condition does not prevent her from pursuing her full duties as a CEO.  (Id.)  On April 19, 2002, Area Director Mitchell restored plaintiff to full duty status, effective immediately.  (Id. ¶ 100.)

Plaintiff amended her EEO complaint on March 26, 2002 to add a claim for retaliation.  (Id. ¶ 141.) On July 29, 2003, DHS issued a final agency decision denying plaintiff's claims in their entirety.  (Id. ¶ 143).  Plaintiff then filed this action on October 27, 2003.

## II. DISCUSSION

### A. Summary Judgment Standard

A motion for summary judgment may not be granted unless the court determines that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004); Anderson v. Liberty Lobby, Inc., 477 U.S. at 248 (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  Yet, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*"  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). It is not enough for the party opposing summary judgment "merely to assert a conclusion without

supplying supporting arguments or facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

There are special dangers in evaluating summary judgment motions in connection with claims of discrimination. "Because direct evidence of . . . discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (quoting Gallo v. Prudential Residential Services, L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)). "However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." Id. (citing Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). Summary judgment continues to "remain[] available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." Pender v. State of New York Office of Mental Retardation and Developmental Disabilities, No. 02 CV 2438, 2006 WL 2013863, at *3-4 (E.D.N.Y. July 18, 2006) (citing McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997); Abdu-Brisson v. Delta Air Lines, Inc., 239 F .3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.")). It is with these standards in mind that I address defendant's motion.

**B. Substantive Rehabilitation Act Claims**

Plaintiff claims substantive violations of the Rehabilitation Act in the form of disparate treatment, hostile work environment, and failure to accommodate. The Second Circuit analyzes such claims using the McDonnell Douglas burden-shifting analysis. See Regional Economic Community Action Program, Inc. v. City of Middletown ("RECAP"), 294 F.3d 35, 48-49 (2d Cir. 2002) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Under McDonnell Douglas, the

initial burden is on the plaintiff to state a prima facie case. Id. In order to do so, plaintiff must demonstrate: (1) that she is a member of the class protected by the statute; (2) that she is qualified for the position; (3) that she suffered some adverse employment action; and (4) that the circumstances surrounding the adverse employment action give rise to an inference of discrimination. Nakis v. Potter, 422 F. Supp. 2d 398, 417-18 (S.D.N.Y. 2006) (citing Kinsella v. Rumsfeld, 320 F.3d 309, 314 (2d Cir. 2003)).

Discrimination claims under the Rehabilitation Act are treated almost identically to claims brought under the Americans with Disabilities Act ("ADA") and cases interpreting the ADA are relevant to our discussion. RECAP, 294 F.3d 35, 48-49 (2d Cir. 2002); see also Peters v. Baldwin Union Free School Dist., 320 F.3d 164, 168 n. 4 (2d Cir. 2003) (citation omitted). The only difference is that under the Rehabilitation Act the defendant must have discriminated against the plaintiff "solely" because of the plaintiff's disability; under the ADA, it is enough if the plaintiff's disability was a motivating factor in the discrimination. RECAP, 294 F.3d at 48-49; Parker v. Columbia Pictures Indus., 204 F.3d 326, 337 (2d Cir. 2000).

**1. Member of the Protected Class: Is Plaintiff Disabled?**

To make a prima facie showing of disability discrimination, plaintiff must first show that she is disabled. Le Prevost v. New York State, No. 03 CV 2544, 2006 WL 2819582, at * 6 (S.D.N.Y. Sept. 29, 2006). The Rehabilitation Act defines an "individual with a disability" as any person who: "has a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" "has a record of such an impairment;" or "is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). Plaintiff argues only that she qualifies under the first category. To satisfy the threshold inquiry into whether she has a substantially limiting impairment,

the plaintiff must establish: (1) that she has suffered a physical or mental impairment; (2) that a major life activity is affected by the impairment; and (3) that the major life activity is *substantially* affected by the impairment.  Le Prevost v. New York State, No. 03 CV 2544, 2006 WL 2819582, at * 6 (S.D.N.Y. Sept. 29, 2006) (emphasis in original) (citing Bragdon v. Abbott, 524 U.S. 624, 631 (1998)).

**a. Impairment**

Plaintiff satisfies the first prong of this analysis.  Plaintiff is afflicted by ADHD, which qualifies as an impairment.  DeMar v. Car-Freshner Corp., 49 F. Supp. 2d 84, 89 (N.D.N.Y. 1999) (citing Bercovitch v. Baldwin School, 133 F.3d 141, 155 (1st Cir. 1998) (noting that "while ADHD is not a learning disability per se, it is listed as a 'mental disorder' in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSMIV)")).  However, merely having an impairment does not make one disabled for purposes of the Rehabilitation Act.  See, e.g., Spychalsky v. Sullivan, No. 01 CV 0958, 2003 WL 22071602, at *7 (E.D.N.Y. Aug. 29, 2003) (internal citations omitted).

"The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."  Conroy v. New York State Dep't of Corr. Servs., 333 F.3d 88, 96 (2d Cir. 2003).  To qualify as disabled, plaintiff must demonstrate that her impairment substantially limits a major life activity.  The burden is on plaintiff to demonstrate this.

**b. Plaintiff's Impairment Affects Major Life Activities**

According to plaintiff, her ADHD affects three major life activities: learning, interacting with

others, and "self-expression," which is how plaintiff labels the ability to express herself orally and in writing.  (Pl. Mem. of Law 6.)  It must first be determined whether or not these are major life activities within the meaning of the statute.  Neither the Rehabilitation Act nor the ADA provide examples of such activities; however, regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") define "major life activities" to include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).  As the Supreme Court has noted, "this list is illustrative, and not exhaustive." Colwell v. Suffolk County Police Dep't., 158 F.3d 635, 642 (2d Cir. 1998) (citing Bragdon v. Abbott, 524 U.S. 624, 625 (1998)).

EEOC regulations establish that learning is a major life activity.  The Second Circuit has held that "interacting with others" can qualify as one as well.  Jacques v. DiMarzio, 386 F.3d 192, 202 (2d Cir. 2004); see also, LaBella v. New York City Admin. for Children's Services, No. 02 CV 2355, 2005 WL 2077192, at *12 (E.D.N.Y. March 28, 2005).  The final category, "ability to express oneself" (Pl. Mem. of Law 6), has never been addressed by the Second Circuit or any other federal court and the plaintiff has offered no authority on its behalf.  Writing has been discussed as a major life activity, Frank v. Plaza Const. Corp., 186 F. Supp. 2d 420, 434 (S.D.N.Y. 2002), though it has never been held as such.  Because it is clear that plaintiff is not substantially limited in this category, this Court need not decide whether or not it is a major life activity.

### c. Plaintiff is Not Substantially Limited in Any Major Life Activity

To qualify as disabled within the meaning of the Rehabilitation Act, the plaintiff must be substantially limited in one of these major life activities.  Beason v. United Technologies Corp., 337 F.3d 271, 277 (2d Cir. 2003).  This standard is interpreted strictly.  Toyota Motor Mfg., Ky., Inc. v.

Williams, 534 U.S. 184, 197 (2005). An impairment substantially affects a major life activity only if a person is (a) unable to perform that activity as a result of the impairment, or (b) if the duration, manner, or condition under which an individual can perform that activity is significantly restricted compared to the average person performing the same activity. 29 C.F.R. § 1630.2(j)(1); Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999). "Minor and temporary impairments of one's ability to engage in major life activities are not actionable." Chandler v. AMR American Eagle Airline, 251 F. Supp. 2d 1173, 1181-82 (E.D.N.Y. 2003) (citing Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 643-44 (2d Cir. 1998)).

Plaintiff has not alleged that she is unable to perform any major life activity, and the record demonstrates that she could not make such an argument. In order to qualify as disabled, therefore, plaintiff must show that her ability to perform a major life activity is significantly restricted compared to the average person performing the same activity. 29 C.F.R. § 1630.2(j)(1). This determination is fact specific and must be made on a case-by-case basis. Reeves v. Johnson Controls World Serv., Inc., 140 F.3d 144, 151 (2d Cir. 1998); Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 872 (2d Cir. 1998). Summary judgment will be granted if plaintiff fails to adduce specific facts demonstrating such a limitation. See, e.g., Blank v. Investec Ernst & Co., No. 97 CV 3260, 2004 WL 2725138, at *5 (S.D.N.Y. Nov. 29, 2004) (citing Chandler, 251 F. Supp. 2d at 1182 (granting summary judgment because "plaintiff has produced no evidence, other than conclusory statements, that he was substantially limited in his ability to engage in a [major life activity]")).

EEOC regulations recommend the following factors be considered in making the determination: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long-

term impact of or resulting from the impairment.  29 C.F.R. § 1630(j)(2); <u>Colwell v. Suffolk County Police Dep't.</u>, 158 F.3d 635, 643 (2d Cir. 1998).  In addition, the relevant disability determination turns not on the symptoms of untreated ADHD, but on plaintiff's ADHD when she received medication and counseling.  <u>See</u> <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 483-84 (1999).

In light of these well-settled considerations, the Court will review the nature and severity of plaintiff's ADHD on the acknowledged major life activities of learning and interacting with others and on "self-expression," which is assumed to be a major life activity for purposes of this decision.

### i. Whether Plaintiff is Substantially Limited in Her Ability to Learn

With regard to her ability to learn, plaintiff denies that she is completely unable to learn because of her ADHD.  (Def. 56.1 Statement ¶ 54.)  Rather, she states that "she needs things explained differently," "she must ask the same question several times," "she must ask more questions," and "she needs things demonstrated for her or written down."  (Pl. Mem. of Law 6.)  Plaintiff also states that she has "difficulty concentrating."  (<u>Id.</u>)  In addition, she states that she is "not auditory at all" and that it would be easier for her if she could see what she was being asked, rather than having someone ask her questions orally.  (Pl. 56.1 Statement ¶ 55.)

The deficiencies of plaintiff's argument are well-stated in an employment discrimination case, decided under the ADA, where the alleged disability was also ADHD.  In that case, the Court granted summary judgment to the defendant because the plaintiff "failed to offer any proof as to how his ability to learn compares with that of the average person."  <u>DeMar v. Car-Freshner Corp.</u>, 49 F. Supp. 2d 84, 91 (N.D.N.Y. 1999).  The same is true here.  Like in <u>DeMar</u>, plaintiff here "misconceives the distinction between an impairment and a 'disability' as defined under the statute."  <u>Id.</u>  By focusing only on her impairment, plaintiff mistakenly leaps to the conclusion that because

she has ADHD, her ability to learn is substantially limited as compared to the average person.  Id.

The Supreme Court has stated that, "[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis [or other evidence] of an impairment.  Instead, claimants must offer evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial."  Spychalsky v. Sullivan, No. 01 CV 0958, 2003 WL 22071602, at *7-8 (E.D.N.Y. Aug. 29, 2003) (quoting Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002) (internal quotations and citations omitted)).  Here, plaintiff provides no meaningful comparison of her learning skills to those of the average person in the general population.  Moreover, plaintiff's own deposition testimony demonstrates that she is able to learn and acquire knowledge and skills as well as an average person.  At her deposition, plaintiff testified that she has "the ability to learn very well" and has been able to comprehend, think and reason, as required by her CEO position.  (Def. 56.1 Statement ¶¶ 43, 55.)  In addition, plaintiff confirmed that as a CEO she has "gained tremendous knowledge of the operations of property management, seizure, or disposition programs."  (Id. ¶ 37.)  Finally, plaintiff testified that her ADHD medications improve her ability to learn by helping her "focus."  (Id. ¶ 55.)

Similarly, plaintiff has provided no evidence that she is substantially limited in her ability to remember, organize, concentrate or pay attention.  On the contrary, plaintiff testified that she is "very good at organizing," and that her ability to remember is not significantly lower than the average person's.  (Id. ¶¶ 72, 84.)  In addition, although plaintiff asserts that her ADHD has caused her some hardships in this area, it does not affect her ability to engage in the activities required for her work as a CEO.  (See, e.g., id. ¶ 88.)

Plaintiff also stated that her difficulties in these areas depend on her stress level and whether

she is interested in the task at hand.  (Id. ¶¶ 80, 86.)  "The fact that plaintiff's impairment varies in intensity and is sporadic in nature weighs against a finding of a substantial limitation."  Glowacki v. Buffalo General Hosp., 2 F. Supp. 2d 346, 352 (W.D.N.Y. 1998).  Based on this record, no reasonable trier of fact could conclude that plaintiff is substantially limited in her ability to learn.

### ii. Whether Plaintiff is Substantially Limited in Her Ability to Interact with Others

The Second Circuit has held that "interacting with others" qualifies as a major life activity when the impairment limits an individual's "fundamental ability to communicate."  Jacques v. DiMarzio, Inc., 386 F.3d 192, 203 (2d Cir. 2004).  Specifically, the Second Circuit stated:

> A plaintiff is "substantially limited" in "interacting with others" when the mental or physical impairment severely limits the fundamental ability to communicate with others.  This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, i.e., to initiate contact with other people and respond to them, or to go among other people – at the most basic level of these activities.  The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective or unsuccessful.  A plaintiff who otherwise can perform the functions of a job with (or without) reasonable accommodation could satisfy this standard by demonstrating isolation resulting from any of a number of severe conditions, including acute or profound cases of: autism, agoraphobia, depression or other conditions that we need not try to anticipate today.

Jacques, 386 F.3d at 203-04.

In the instant case, plaintiff does not allege the kind of basic communication limitations contemplated by the Jacques court.  Rather, plaintiff's allegations reveal that she had trouble getting along with her co-workers because of her tendency to speak impulsively, be impatient, and get frustrated easily.  (Def. 56.1 Statement ¶¶ 75-76; Pl. Dep. 395.)  Physicians who have treated plaintiff's ADHD have confirmed that plaintiff experiences difficulty interacting with others.  (Pl. Mem. of Law 7.)  Yet, the fact that plaintiff's treating physicians have confirmed that she indeed exhibits such behavior does not mean that she is disabled within the meaning of the statute.

Plaintiff's deposition testimony refutes any claim that she is substantially limited in the life activity of "interacting with others." Indeed, her deposition is particularly revealing in that plaintiffs presents as an articulate and perceptive witness. See similarly, LaBella v. New York City Admin. for Children's Services, No. 02 CV 2355, 2005 WL 2077192, at *13 (E.D.N.Y. March 28, 2005).

Plaintiff's asserted inability to interact and communicate with others clearly falls into the category of "inappropriate, ineffective or unsuccessful" behavior abnormalities that have been explicitly excluded from protection by Jacques. 386 F.3d at 203-04; see also LaBella, 2005 WL 2077192, at *13. Other courts in this Circuit have similarly held that "mere trouble getting along with coworkers is not sufficient to show a substantial limitation." Baerga v. Hospital For Special Surgery, No. 97 CV 0230, 2003 WL 22251294, at *7 (S.D.N.Y. Sept. 30, 2003) (citing Zale v. Sikorsky Aircraft Corporation, No. 97 CV125, 2000 WL 306943, at *5 (D. Conn. Feb. 7, 2000) (finding that plaintiff's poor anger control and feelings of detachment from others stemming from diagnosed Post Traumatic Stress Disorder impaired social interactions only moderately and, therefore, were insufficient to establish substantially limited social interactions) (internal citations omitted)). Although plaintiff claims that such behavior is a "manifestation" of her ADHD (Pl. Mem. of Law 6), no reasonable juror could find that it rises to the level of substantial limitation "at the most basic level." See Jacques, 386 F.3d at 203.

### iii. Whether Plaintiff is Substantially Limited in her Ability to Express Herself in Writing

Plaintiff has similarly failed to offer any evidence that would allow a reasonable trier of fact to conclude that she is substantially limited in her ability to express herself in writing or orally. Her contention regarding her ability to express herself orally is dealt with above. As to her ability to express herself in writing, there is no evidence in this record to indicate that plaintiff's overall ability

to write is substantially limited. Plaintiff simply declares that writing is difficult for her, but offers nothing to suggest that it is more difficult for her than the average person. (Pl. Depo. at 383-85.) On the contrary, plaintiff is a college graduate who was required to complete writing assignments throughout college. (Id. at 388)

Drawing all inferences in her favor, plaintiff has failed to meet her burden of creating a triable issue that she is disabled within the meaning of the Rehabilitation Act. Conclusory assertions that plaintiff has a hard time communicating and is slower at writing and learning new things than others simply permits no such conclusion. Neither "conclusory statements, conjecture, [n]or speculation" suffices to defeat summary judgment. Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996); see also Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995) (unsupported assertions and conclusory statements are not considered on motion for summary judgment); DeMar v. Car-Freshner Corp., 49 F. Supp. 2d 84, 91 (N.D.N.Y. 1999) (granting summary judgment because "[n]otably absent from Plaintiff's allegations are specific facts or evidence demonstrating that Plaintiff is substantially limited . . . in comparison to the general population").

Accordingly, I find that plaintiff does not have a mental or physical impairment that substantially limits one or more of her major life activities. Thus, she is not disabled within the meaning of the statute and her substantive Rehabilitation Act claims are dismissed. Her retaliation claim under this statute will be analyzed supra at Part. II.D.

## C. Substantive Title VII Claims

Plaintiff also claims discrimination on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"). She claims she was subject to disparate treatment and a hostile work environment. In addition, she claims she was the

victim of unlawful retaliation for complaining about the discrimination, which will be addressed supra at Part II.D. Defendant moves for summary judgment on these claims.

**1. Disparate Treatment Claim**

Plaintiff may establish a prima facie case of sex discrimination under Title VII by showing: (1) she is a member of the protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 80 (1973); Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006). There is no dispute that plaintiff, a female, is a member of the protected class under Title VII. In addition, there is no dispute that she is qualified for her position. At issue is whether plaintiff suffered any actionable adverse employment action and, if so, whether such action occurred under actionable circumstances.

**a. Adverse Employment Action**

Plaintiff can demonstrate an adverse employment action if she endured a "materially adverse change" in the terms and conditions of her employment. Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). To be "materially adverse," plaintiff's working conditions must undergo a change "more disruptive than a mere inconvenience or an alteration in job responsibilities." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006). In addition, the alleged adverse acts must be asserted in a timely fashion, in accordance with EEOC guidelines.

**i. Timeliness of Alleged Acts**

Under applicable EEOC regulations, a federal employee claiming a violation of Title VII must first consult a counselor at his agency's EEO office within forty-five days of the alleged discriminatory act. 29 C.F.R. § 1614.105(a)(1). Failure to act in a timely manner usually results

in the claim being time-barred.  See, e.g., Boos v. Runyon, 201 F.3d 178, 181 (2d Cir. 2000); Cherry v. Potter, No. 04 CV 1578, 2005 WL 1085119, at *3 (S.D.N.Y. May 5, 2005).  Here, plaintiff first sought EEO counseling on April 27, 2001.  (Def. 56.1 Statement ¶ 138.)  She filed a formal complaint July 12, 2001.  (Id. ¶ 139.)  Because of this, defendant claims that all alleged adverse incidents which occurred before March 13, 2001 are time-barred.

The forty-five day "timeliness requirement is analogous to a statute of limitations and is therefore subject to equitable tolling."  Columbo v. U.S. Postal Service, 293 F. Supp. 2d 219, 223 (E.D.N.Y. 2003) (internal citations omitted).  Equitable tolling "permits courts to extend a statute of limitations on a case-by-case basis to prevent inequality;" however, "such tolling applies only in rare and exceptional circumstances."  Id. (internal citations omitted).  Here, plaintiff argues that all the incidents she alleges are timely regardless of the forty-five day requirement because of the continuing violation doctrine.[3]  (Pl. Mem. of Law 19-20.)

The continuing violation doctrine allows a plaintiff to assert otherwise time-barred acts  "if [the] plaintiff has experienced a continuous policy of discrimination."  Mirasol v. Gutierrez, No. 05 CV 6368, 2006 WL 871028, at *3 (S.D.N.Y. Apr. 5, 2006) (citing Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001)).  This doctrine "is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances."  Trinidad v. New York City Dep't of Correction, No. 04 CV 03261, 2006 WL 704163, at *9 n. 11 (S.D.N.Y. Mar. 21, 2006) (internal citations omitted).  Moreover, the Supreme Court has endorsed a restricted scope of the doctrine and held that "[e]ach discrete discriminatory act starts a new clock for filing charges

---

[3] Plaintiff also argues that the continuing violation doctrine applies to her Title VII hostile work environment claim.  See supra at Part II.C.3.

alleging that act." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002); see also Nakis v. Potter, 422 F. Supp. 2d 398, 409-10 (S.D.N.Y. 2006). "Distinguishing between discrete discriminatory acts and ongoing violations such as hostile work environment claims, the [ ] Court . . . held that discrete acts 'are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" Mirasol v. Gutierrez, 2006 WL 871028, at *4 (citing Morgan, 536 U.S. at 113-116). Because plaintiff has offered no basis whatsoever for applying the continuing violation doctrine to her claims of disparate treatment, only claims based on adverse acts occurring after March 13, 2001 are valid.

**ii. Materially Adverse Acts**

Plaintiff's complaint alleges acts which occurred after March 13, 2001. (Compl. ¶¶ 22(j), (k), (dd) - (gg).) For example, plaintiff alleges that: she was falsely accused of not "running a flight;" her Branch Chief proposed she be suspended; a supervisor made inappropriate references to her personal life; she was excluded from a staff meeting; a supervisor falsely claimed she tried to run him over; and she was not nominated for a "share award." (Id.) In addition, she generally claims, without giving dates, that she is often the victim of excessive scrutiny, unfair work assignments, and unfair overtime assignments. (See, e.g., Compl. ¶¶ 22(l), (m), (p), (r).) Plaintiff also alleges that an adverse act took place when a supervisor proposed that she be suspended for thirty days. (Compl. ¶ 22(k).)

The Second Circuit provides the following as examples of adverse acts: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished responsibilities." Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005). On the other hand, "[e]xcessive scrutiny, without more, does not

constitute an adverse employment action." Hill v. Rayboy-Brauestein, No. 02 CV 3770, 2006 WL 3298383, at *10 (S.D.N.Y. Nov. 9, 2006) (citing Fleming v. Verizon N. Y., Inc., No. 03 CV 5639, 2006 WL 2709766, at *11 (S.D.N.Y. Sept. 22, 2006) (stating that excessive monitoring and oversight of work do not constitute adverse employment action); Uddin v. City of New York, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006)). Thus, plaintiff's complaints regarding excessive scrutiny will not be considered. In addition, "[n]egative evaluations alone, without any accompanying adverse consequence are not adverse employment actions." Gamble v. Chertoff, No. 04 CV 9410, 2006 WL 3794290, at *6 (S.D.N.Y. Dec. 27, 2006) (citing Pellei v. Int'l Planned Parenthood Federation/Western Hemisphere Region, Inc., No. 96 CV 7014, 1999 WL 787753, at *12 (S.D.N.Y. Sept. 30, 1999)). Thus, plaintiff's complaint that she was not nominated for an award, a considerably less material act than an official negative evaluation, will not be considered.

Moreover, many of plaintiff's allegations are not actionable adverse acts because plaintiff has not shown that they had any negative consequences. "When an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action." Hill v. Rayboy-Brauestein, 2006 WL 3298383, at *8 (citing Kravitz v. N.Y. City Transit Auth., No. 94 CV 5910, 2001 WL 1646513, at *6-7 (E.D.N.Y. Dec. 18, 2001)); see also Gamble v. Chertoff, No. 04 CV 9401, 2006 WL 3794290, at *6 (S.D.N.Y. Dec. 27, 2006). The proposed suspension is not an adverse act for this reason.[4] Plaintiff has provided no facts to establish how this proposed suspension affected the terms or

---

[4] Defendant argues that the proposed suspension is also not actionable because it was "the subject of a union grievance and arbitration proceeding" which was "settled in May 2003 by [p]laintiff, her union and the Customs Service." (Def. Mem. of Law 32.) This Court need not address this issue here.

conditions of her employment.

As described, the majority of the remaining allegations in plaintiff's complaint do not meet the requirement of a materially adverse action. In fact, many of these allegations do not demonstrate any action at all, but rather are complaints of behavior that are more appropriately addressed in a hostile work environment claim. The only alleged act that is a close call is plaintiff's lack of overtime. Not being assigned overtime can result in a material loss of pay and may be considered an adverse act. See, e.g., Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (finding an adverse act where plaintiff was not allowed to earn overtime pay, among other things).

"The Second Circuit has made clear that the concept of an adverse employment action has been defined broadly and that 'whether an undesirable employment action qualifies as being adverse is a heavily fact-specific, contextual determination.'" Kear v. Katonah Lewisboro Central School Dist., No. 05 CV 7038, 2007 WL 431883, at *6 (S.D.N.Y. Feb. 7, 2007) (quoting New York State Law Officers Union v. Andreucci, 433 F.3d 320, 328 (2d Cir. 2006)). Although plaintiff's showing of an adverse employment action is not overly compelling, this Court need not decide if she has met her burden. Even were the Court to find that plaintiff's lack of overtime allegation suffices to plead an adverse employment action, her claim cannot not succeed because – as explained below – she does not raise any material issue of fact that the actions she suffered were due to her protected status.

**iv. No Inference of Discrimination Because of Sex**

To make out her prima facie case, plaintiff must demonstrate that any adverse act taken against her was taken due to her protected status. Alfano v. Costello, 294 F.3d 365, 377-78 (2d Cir. 2002). Although she asserts more than thirty acts of harassment, the record is almost barren of any evidence showing this requisite intent. First, plaintiff's own testimony undermines her claim that

any adverse treatment she received was based on her sex. At several times during her deposition, plaintiff remarked that the factor which determined how she was treated was her ADHD, specifically "the way it manifests itself" in her personality. (See, e.g., Pl. 56.1 Statement ¶¶ 129-31.) Although she summarily disputes that she has no evidence that her sex caused her harassment, (see, e.g.,id. ¶¶ 120-22) she offers no evidence to the contrary (Def. 56.1 Statement ¶¶ 120-24 126-27, 129, 131, 133, 134).

Moreover, plaintiff provides no evidence that women in general are treated any worse than men in her workplace, or that she is treated worse than any male. Such a comparison is one means of demonstrating disparate treatment. See, e.g., Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) ("A showing of disparate treatment – that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' – is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case.") (citation omitted). On the contrary, plaintiff admitted that the treatment of CEOs depends not on sex, but on whether or not a CEO is in the "in group" or the "out group." (Def. 56.1 Statement ¶ 103.) Members of the clique that received preferential treatment included women, and of the CEOs not in the "in group," some were men. (Def 56.1 Statement ¶¶ 104, 109, 110, 112.) This undisputed fact indicates that sex was not the basis for any adverse treatment. Plaintiff's proof may be probative of the fact that she was discriminated against because she was not liked, but such discrimination is not based on sex and does not form the basis of a cause of action under Title VII. See similarly Pender v. State of New York Office of Mental Retardation and Developmental Disabilities, No. 02 CV 2438, 2006 WL 2013863, at *6 (E.D.N.Y. July 18, 2006) (discussing race discrimination). Thus, summary judgment is granted to defendant on plaintiff's Title VII claims of

disparate treatment.

### 3. Hostile Work Environment Claim

Much of the foregoing analysis applies to plaintiff's hostile work environment claim as well, as many of the same acts provide the basis of each. To establish a Title VII claim of hostile work environment, plaintiff must show that she was subjected to harassment "sufficiently severe or pervasive to alter the conditions of [her] employment and create a hostile working environment." Harris v. Forklift Systems, 510 U.S. 17, 21 (1993). She must also demonstrate that the harassing conduct occurred because of her sex. Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998) (holding that Title VII "is directed only at "discriminat[ion] . . . *because of* . . . sex") (emphasis added).

"A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." Brennan v. Metropolitan Opera Ass'n, Inc*.,* 192 F.3d 310, 318 (2d Cir. 1999); see also Fairbrother v. Morrison*,* 412 F.3d 39, 48 (2d Cir. 2005) (holding that a hostile work environment claim has both objective and subjective elements). It is clear that plaintiff subjectively perceives her work environment to be abusive. The issue is whether her working environment is objectively hostile and whether the harassment she suffered occurred because of her protected status.

### i. Timeliness: Application of Continuing Violation Doctrine

Unlike the disparate treatment claim, it is appropriate to apply the continuing violation doctrine to the incidents comprising plaintiff's hostile work environment claim. Where a plaintiff alleges a hostile environment, conduct outside the applicable limitations period may be considered so long as one act giving rise to the hostile environment claim is within the limitations period. Nat'l

R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002); see also Petrosino v. Bell Atlantic, 385 F.3d 210, 220 (2d Cir. 2004). The rationale is that such a claim "is comprised of a series of separate acts that collectively constitute one unlawful employment practice." Morgan, 536 U.S. at 117 (internal citations omitted); see also Elmenayer v. ABF Freight System, Inc., 318 F.3d 130, 134 (2d Cir. 2003). Here, plaintiff has alleged at least one act within the forty-five day limitations period set out in 29 C.F.R. § 1614.105(a)(1). (See, e.g., Compl. ¶¶ 22(dd)-(gg).) Thus, all acts alleged in the complaint will be examined as part of the hostile work environment claim.

**ii. Alleged Hostile Environment Must Be Due to Plaintiff's Protected Status**

Plaintiff claims she has been subjected to a hostile work environment since shortly after the inception of her employment in September 1997. Many of the incidents she cites in support of her claim fall into the following categories: (i) excessive scrutiny; (ii) derogatory comments and name-calling; (iii) rumors; and (iv) offensive posters. As described infra, plaintiff also generally alleges that she is treated as a social outcast. As a result of this, she alleges that she does not receive the same opportunities as some of her co-workers.

The Second Circuit has stated that only conduct prompted by plaintiff's membership in a protected class "contributes to a hostile work environment claim." Bush v. Fordham University, 452 F. Supp. 2d 394, 413 (S.D.N.Y. 2006) (citations omitted); see also Woods v. Enlarged City School Dist. of Newburgh, No. 04 CV 9106, 2007 WL 431016, at *16 (S.D.N.Y. Feb. 7, 2007). There must be some "linkage or correlation to the claimed ground of discrimination. Otherwise the federal courts will become a court of personnel appeals." Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002). "Title VII does not establish a 'general civility code' for the American workplace." Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004) (citing Oncale v. Sundowner Offshore

Servs., Inc., 523 U.S. 75, 81(1998)). "Title VII protects employees from improper discriminatory intimidation, [but] it does not reach so far as to protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors." Murphy v. Board of Educ. of Rochester City School Dist., 273 F. Supp. 2d 292, 312 (W.D.N.Y. 2003) (citing Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234, 250 (S.D.N.Y. 2000)).

For the vast majority of the alleged incidents, plaintiff has provided no evidence that they were provoked by her sex. Many of plaintiff's allegations refer to derogatory remarks, but these remarks generally do not regard plaintiff's sex. Instead, as plaintiff admits, the derogatory comments pertained to her personality and her ADHD manifestations.[5] (Def. 56.1 Statement ¶ 114.) In addition, many of plaintiff's allegations concern excessive scrutiny. (See, e.g., id. ¶¶ 120, 121.) For example, plaintiff complains that she was screamed at by her supervisor, that disciplinary action was inappropriately threatened, and that her work was watched closely. (Compl. ¶¶ 22.) Plaintiff has similarly offered no showing that this scrutiny was because of her sex.

It is true, as plaintiff contends (Pl. Mem. of Law 14), that "incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination – for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not." Alfano v. Costello, 294 F.3d 365, 375 (2d Cir. 2002). "But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." Id. at 378. Where, as here, there is no basis for such a finding, the sex-neutral incidents need not be considered. See, e.g., id. at 380; O'Neal v. State University of New York, No. 01 CV 7802, 2006

---

[5] Derogatory comments included: "You don't belong here," "What is wrong with you?," "Everyone refuses to work with you," and "Get [your] head out of [your] ass." (Compl. ¶ 22(f).)

WL 3246935, at *7-8 (E.D.N.Y. Nov. 8. 2006); <u>Aina v. City of New York</u>, No. 05 CV 7553, 2007 WL 401391, at *5 (S.D.N.Y. Feb. 6, 2007). For this reason, most of plaintiff's allegations of abuse do not demonstrate sex discrimination and will not be credited for purposes of this hostile environment claim. <u>See</u>, <u>e.g.</u>, <u>Aina</u>, 2007 WL 401391, at *5.

### iii. Alleged Incidents Related to Plaintiff's Protected Status

Plaintiff's most compelling hostile environment argument is based on very few incidents: (1) rumors circulated about her sexual behavior; (2) a poster with sexual connotations;[6] and (3) comments with sexual overtones made by a supervisor. These incidents were spread out over years of employment, from 1998 to 2001. As to the rumors, plaintiff alleges that she "has been told of rumors spread by defendant and his agents concerning [her] sexual behavior." (Def. 56.1 Statement ¶ 132.) Specifically, plaintiff alleges the specifics of only one rumor, which circulated during her first year at JFK Airport, that she had performed oral sex on the then-Branch Chief. (<u>Id.</u>) The poster was found by plaintiff sometime in 2000. (<u>Id.</u> ¶ 134.) It shows a picture of plaintiff and her detector dog with the caption, "For a good time call: 1 (976) one gram." (<u>Id.</u>) Finally, plaintiff's supervisor, SCEO Failla, made repeated comments with sexual overtones to plaintiff. Failla would say to her, "I have to tell you, I am a married man," when plaintiff would approach him with a question. (Def. 56.1 Statement ¶ 136.) Plaintiff alleges that this conduct occurred three times a month. (<u>Id.</u>) Yet,

---

[6] Plaintiff saw three "posters in the workplace which were intended to ridicule her." (Def. 56.1 Statement ¶ 133; Ex. 19.) Each was the size of a standard piece of paper. (<u>Id.</u>) Only one, discussed in the main text, was arguably related to plaintiff's sex. The other two posters are described as follows. Found by plaintiff in her work mailbox in late 1999, the first poster is an official report of a narcotics seizure made by plaintiff with the word "gimme" written on it. (<u>Id.</u>) Plaintiff testified that she understood this to be belittling the significance of one of her seizures. (<u>Id.</u>) Found in 2000 with the poster discussed in the main text, the other poster shows a crying baby with the caption, "I didn't get to run a domestic flight." (<u>Id.</u> ¶ 134.)

plaintiff admitted that she was "not sure" if these comments were derogatory or hostile and that she did not believe that her supervisor was coming on to her. (Id.)

In determining whether these incidents comprised an environment that is sufficiently hostile to support a claim under Title VII, a court must consider "the totality of circumstances." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999). Factors include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). Generally, "incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)).

The sex-based incidents alleged here are certainly not continuous or pervasive. Except for the comments made by plaintiff's supervisor, which plaintiff admitted did not particularly offend her, they occurred sporadically over a period of three to four years. She was never physically threatened. The most objectively humiliating incident, plaintiff's discovery of the poster, was not intentional – the poster was not displayed anywhere in the workplace; rather, plaintiff found it in a supervisor's closed metal clipboard which was in his vehicle. (Def. 56.1 Statement ¶ 134.)

While the poster may have been humiliating to plaintiff, even considered together with the other alleged sex-based incidents, no reasonable juror could find such to be a hostile work environment. "There is no incident here of such severity and character as to itself subvert the plaintiff's ability to function in the workplace." Alfano v. Costello, 294 F.3d at 380 (discussing Howley v. Town of Stratford, 217 F.3d 141 (2d Cir. 2000)). "In this Circuit and others, hostile work

environment claims have been dismissed for insufficiency of evidence even though, compared to what was adduced here, they involved [1] a similar or greater number of incidents, [2] that were more compressed in time, and [3] that were more severe and had more pronounced discriminatory overtones." Alfano v. Costello, 294 F.3d at 379 (reviewing Second Circuit cases).

Taken in the light most favorable to plaintiff, these allegations are neither pervasive nor severe. No reasonable fact-finder could find that as a result of these three incidents over a three to four year period, plaintiff's workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) (citing Harris v. Forklift Sys., Inc., 510 U.S. at 21; Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)). Clearly, plaintiff perceives all the incidents alleged in her complaint to be hostile, but when one takes a step back and examines the environment as a whole, there is very little indication that any hostility was caused by the fact that she is a woman. Rather, there is overwhelming evidence that the hostility toward plaintiff was "grounded in workplace dynamics unrelated to her sex and that even the most harassing conduct did not reflect an attack on her *as a woman*." See Brown v. Henderson, 257 F.3d 246, 256 (2d Cir. 2001) (emphasis in original). For this and the above-mentioned reasons, summary judgment is granted to the defendant on plaintiff's claim of a hostile work environment.

**D. Retaliation Claims**

Plaintiff also asserts a claim of discriminatory retaliation in violation of both the Rehabilitation Act and Title VII. Although plaintiff's substantive claims under these statutes were dismissed, her claims for retaliation survive because "a successful discrimination claim is not a

predicate for a retaliation claim." Melendez v. Monroe College, No. 04 CV 2266, 2006 WL 2882568, at *8 (E.D.N.Y. Oct. 6, 2006) (citations omitted). Thus, plaintiff can "still state a claim for retaliation if [s]he took action to protest practices [s]he reasonably believed to be discriminatory." Myers v. New York City Human Rights Comm'n, No. 04 CV 543, 2006 WL 344754, at *9 (S.D.N.Y. Feb. 15, 2006) (citing Keating v. Gaffney, 182 F. Supp. 2d 278, 288 (E.D.N.Y. 2001)).

Under both these statutes, a plaintiff alleging retaliation must establish: (1) participation in a protected activity known to the defendant; (2) that the employer took adverse action against the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action, i.e., that a retaliatory motive played a part in the adverse employment action. Kessler v. Westchester County Dep't. of Social Services, 461 F.3d 199, 206 (2d Cir. 2006) (Title VII standard for retaliation) (citations omitted); Weixel v. Bd. of Educ. of the City of New York, 287 F.3d 138, 148 (2d Cir. 2002) (Rehabilitation Act standard for retaliation).

Retaliation claims are examined with the same McDonnell Douglas burden-shifting analysis used for discrimination claims. See Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003). Thus, plaintiff bears the initial burden of establishing her prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Once a plaintiff has satisfied this burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for the action. Id. If such a showing is made, the burden shifts back to plaintiff to prove that the proffered reason is merely a pretext for unlawful discrimination. Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006).

Here, plaintiff contacted an EEO counselor on April 27, 2001 (Def. 56.1 Statement ¶ 138)

and filed a complaint with the office on July 12, 2001 (Id. ¶ 139). These are clearly protected activities which were known to her employer. Thus, the first element of plaintiff's retaliation claim is met; defendant does not contest this.

**i. Adverse Acts**

To establish the second element of her prima facie retaliation claim, plaintiff alleges that, following the filing of her EEO complaint, adverse action was taken by her employer when "she was restricted from using her weapon, removed from her position as CEO assigned to the Outbound Enforcement Team and asked to undergo a fitness for duty examination." (Pl. Mem. of Law 15.) In addition, plaintiff asserts that as a result of this temporary reassignment she was unable to work overtime. (Pl. Mem. of Law 17.) Defendant argues that these acts do not qualify as "adverse employment actions." (Def. Mem. of Law 26-27.)

"The Supreme Court recently promulgated a new standard for determining the existence of an adverse employment action in a retaliation claim." Moore v. Consolidated Edison Company of New York, Inc., No. 00 CV 7384, 2007 WL 831807, at *6 (S.D.N.Y. March 20, 2007) (citing Burlington Northern & Santa Fe Ry. v. White, – U.S. –, 126 S. Ct. 2405, 2415 (2006)). The Supreme Court broadened the standard so that now, for purposes of a retaliation claim, an adverse employment action is one which "a reasonable employee would have found [to be] materially adverse" and which would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 126 S. Ct. at 2415; see also Kessler v. Westchester County Dep't of Social Services, 461 F.3d 199, 207-08 (2d Cir. 2006) (recognizing new standard). Such actions need not affect the terms and conditions of employment. Burlington Northern, 126 S. Ct. at 2412-13; Messer v. Board of Educ. of City of New York, No. 01 CV 6129, 2007 WL 136027, at

*13 (E.D.N.Y. Jan. 16, 2007).

Viewed in the light most favorable to the plaintiff, a reasonable juror could find that the actions taken by defendant satisfy this standard. Losing the ability to carry a firearm and work overtime hours are not simply trivial "alterations of job responsibilities," as defendant claims. (Def. Mem. of Law 26-27.) Rather, carrying a weapon goes to the heart of plaintiff's job responsibilities. In effect, although her salary did not change, plaintiff was temporarily demoted. This is sufficient to establish a factual issue as to whether a reasonable employee would be deterred from reporting discrimination. See, e.g., Burlington Northern, 126 S. Ct. at 2417 (evidence that plaintiff's tasks became dirtier, more arduous, and less prestigious sufficed to support a jury verdict in her favor); Kessler, 461 F.3d at 209 (finding the existence of a factual issue when a transfer stripped the plaintiff of numerous responsibilities).

### ii. Causal Connection

Plaintiff's ability to satisfy the requirement of a causal connection between the adverse action and the protected activity is more tenuous. "It is well settled that if a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause, the law is violated. Likewise, if the employer was at all motivated by retaliatory animus, the law is violated even if there were objectively valid grounds for the adverse employment action." Messer, 2007 WL 136027, at *14 (citations omitted). Thus, in determining whether plaintiff has satisfied her burden, the court's role is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Id. (citing Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)). This may be established either through direct evidence of retaliatory animus, or by circumstantial evidence. Messer, 2007 WL 136027, at *14 (citing Sumner v. U.S.

31

Postal Service, 899 F.2d 203, 209 (2d Cir. 1990)).

Here, it is clear that defendant acted against plaintiff at least in part due to her protected activity. The filing of plaintiff's EEO complaint led to a meeting in which plaintiff was asked to provide medical documentation about her ADHD and how it might affect her ability to perform her duties as CEO, including her ability to carry a firearm. (Def. 56.1 Statement ¶ 90.) Plaintiff provided this documentation, which led defendant to restrict plaintiff's duties and request that she submit to the fitness-for-duty examination. (Def. 56.1 Statement ¶¶ 89-96.) But-for causation seems obvious; the real issue is whether retaliatory animus played any role in the decision. To determine whether or not it did, I assume that plaintiff has made out her prima facie case of retaliation and examine defendant's offered justification for the action.

### iii. Defendant's Legitimate, Nondiscriminatory Reason for the Challenged Action

When a plaintiff has made out her prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for the alleged retaliatory acts. See Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004). "Defendant's burden is satisfied if the proffered evidence taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." Ricci v. DeStefano, No. 04 CV 1109, 2006 WL 2828419, at *9 (D. Conn. Sept. 28, 2006) (quoting Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000)). This burden of production is not very demanding. See Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999).

Defendant argues that the decision to order plaintiff to forgo carrying a gun and undergo a fitness-for-duty examination was "based on patently reasonable concerns about how plaintiff's ADHD affects her ability to perform her job." (Def. Mem. of Law 31.) Specifically, defendant's

concern was that plaintiff's ADHD, and the medication she took to treat it, interfered with her ability to carry out her duties as a CEO. (See Dkt. No. 40-12: Letter from Susan T. Mitchell, dated Feb. 26, 2002, attached to Def. Mot. Summ. J. as Ex. 25 ("Mitchell Letter").) These concerns were grounded in the complaints alleged in plaintiff's EEO complaint and her demands for reasonable accommodation, which included written instructions and additional time to complete and organize assignments. (Id.) Defendant's concerns were additionally underscored at the meeting held to discuss plaintiff's complaint where she was described as "distraught," "confused," "too emotional," and "uncommunicative." (Id.)

Director Mitchell's concerns were documented in the letter that put plaintiff on restricted duty and requested she submit to the fitness-for-duty exam. (Id.) In sum, the letter states that 5 C.F.R. § 339.301 authorizes federal agencies to require an employee to submit to medical and psychiatric evaluations whenever an employee holds a position with medical standards and when there is a direct question regarding the employee's capacity to meet such requirements. (Id.) Plaintiff's position as a CEO encompasses specifically defined physical and medical standards, which include: "skill in the use of firearms and knowledge of firearms policy; the knowledge and ability to apply Customs and other agency laws, regulations and policies, and procedures; the ability to make accurate judgments and prompt decisions for enforcement and facilitation purposes; and numerous other requirements." (Id.) In addition, a CEO "must make rapid, accurate judgments and decisions." (Id. (citing Summary of Medical Standards and Physical Requirements for a Canine Enforcement Officer.))

Questions concerning plaintiff's capacity to perform her duties were raised by plaintiff's behavior at the above-mentioned meeting, her ADHD and prescribed medication and their affects

on her, and a letter provided by plaintiff from Dr. Feldman, a psychiatrist. (See Mitchell Letter; Dkt. No. 40-12: Letter from Dr. Roger P. Feldman, dated Dec. 4, 2001, attached to Def. Mot. Summ. J. as Ex. 23 ("Feldman Letter").) Dr. Feldman characterized plaintiff as very affected by her ADD, especially regarding her functioning at work. (Id.) As urged by defendant, "the highly sensitive and potentially dangerous nature of plaintiff's CEO position" demonstrated the importance of evaluating plaintiff's mental health. (Id.)

The reasonableness of Director Mitchell's decision to place plaintiff on restricted leave was substantiated when the evaluating physician, Dr. Nemetz, recommended an additional "full evaluation by an independent psychiatric consultant." (Dkt. No. 40-12: Letter from Dr. Avram L. Nemetz, dated March 14, 2002, attached to Def. Mot. Summ. J. as Ex. 26 ("Nemetz Letter").) This recommendation for further testing demonstrates that defendant's concerns had merit.

The independent psychiatric consultant, Dr. Podell, examined plaintiff on April 9, 2002. (Def. 56.1 Statement ¶ 99.) Dr. Podell concluded that plaintiff's "problems do not amount to a psychiatric condition or disability," and that she did not have a "condition that would prevent her from pursuing her full duties as a Canine Enforcement Officer." (Id.) On April 19, 2002, within days of receiving the results of the full fitness-for-duty evaluation clearing plaintiff for work, Director Mitchell promptly restored plaintiff to full duty. (See Dkt. No. 40-12: Letter from Susan T. Mitchell, dated April 19, 2002, attached to Def. Mot. Summ. J. as Ex. 29 ("Mitchell Letter II"); Def. 56.1 Statement ¶ 100.) In total, plaintiff was without her firearm and overtime opportunities from February 26, 2002 to April 19, 2002, a time period of less than eight weeks. During this time her salary was unchanged. (Def. 56.1 Statement ¶ 101.) The speed at which plaintiff was reinstated to full duty status supports defendant's stated justification for the action. In sum, I am satisfied that

defendant has demonstrated a legitimate reason for the challenged employment action.

### iv. Pretext

Once a defendant has met the burden of articulating a legitimate, non-retaliatory reason for the challenged employment decision, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002). To do this, plaintiff is "obliged to produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [retaliation for complaints of discrimination] was the real reason for the discharge.'" Melendez v. Monroe College, No. 04 CV 2266, 2006 WL 2882568, at *9 (E.D.N.Y. Oct. 6, 2006) (citing Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)).

Plaintiff has failed to put forward sufficient evidence to satisfy her ultimate burden of proof and permit an inference of pretext. Plaintiff's only argument is that the fitness-for-duty examination was requested after plaintiff filed her EEO complaint, despite defendant's prior knowledge of plaintiff's ADHD. (Pl. Mem. of Law 17.) This is the argument plaintiff put forward to establish causation in her prima facie case. The argument does not demonstrate retaliatory motive, nor does it contradict defendant's justification or make it "more likely than not [discrimination] was the real reason for the discharge.'" Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (citations omitted).

While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of plaintiff's prima facie case, without more, such temporal proximity is insufficient to

satisfy her burden to bring forward some evidence of pretext.[7]  See Quinn v. Green Tree Credit

Corp., 159 F.3d 759, 770 (2d Cir. 1998) (holding that a strong temporal connection between the

plaintiff's complaint *and* other circumstantial evidence is sufficient to raise an issue with respect to

pretext); Golub v. City of New York, 334 F. Supp. 2d 399, 409 (S.D.N.Y. 2004) (noting that

"temporal proximity between knowledge of a protected activity and an adverse employment action

may be sufficient to establish causal connection or retaliatory motive in some cases").  Plaintiff must

point to specific evidence from which a reasonable trier of fact could conclude that defendant's

proffered reason was merely pretextual.  Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001) (where

the plaintiff has adduced evidence sufficient to constitute a prima facie case, and the employer has

articulated a legitimate nonretaliatory reason for the adverse action, the plaintiff must point to

evidence that would be sufficient to permit a rational factfinder to conclude that the employer's

explanation is merely a pretext for impermissible retaliation); Crowe v. Brooklyn Hosp. Center, No.

02 CV 5938, 2005 WL 1638740, at *9 (E.D.N.Y. July 12, 2005).  She has not done so.  Because

plaintiff has failed to create a genuine issue of material fact on her retaliation claim, summary

judgment is granted.

---

[7] The temporal proximity itself is not all that compelling.  Plaintiff first complained to an
EEO counselor on April 27, 2001 and she filed her EEO complaint on July 12, 2001.  Plaintiff
was not placed on restricted leave until February 27, 2002.  See Hollander v. American
Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (even a three and one-half month interval
between protected activity and alleged retaliation may be insufficient to establish a causal
connection).

### III. CONCLUSION

For the above stated reasons, I find there is no genuine issue of material fact on any of plaintiff's discrimination claims. Thus, defendant's motion for summary judgment is hereby granted.

Dated: April 25, 2007
      Brooklyn, New York

                               /s/
                          JOAN M. AZRACK
                          UNITED STATES MAGISTRATE JUDGE